*Aaron Jarvis v. State of Maryland*, No. 22, September Term, 2023. Opinion by Eaves, J.

**CRIMINAL LAW — JURY INSTRUCTIONS — "SOME EVIDENCE" STANDARD — IMPERFECT SELF-DEFENSE**

The Supreme Court of Maryland held that Petitioner, Aaron Jarvis, did not produce "some evidence" that showed that he subjectively believed that his use of deadly force—stabbing the victim with a knife—was necessary for self-defense. Thus, the Supreme Court held that the circuit court did not err when it refused to instruct the jury on imperfect self-defense, even though the circuit court instructed the jury on perfect self-defense.

Circuit Court for Cecil County
Case No. C-07-CR-19-000806
Argued: April 5, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 22

September Term, 2023

AARON JARVIS

v.

STATE OF MARYLAND

Fader, C.J.
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Opinion by Eaves, J.
Watts and Gould, JJ., dissent.

Filed: August 12, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

# I
# INTRODUCTION

The events of this case arise from a family dispute gone awry. Katie Durrett and Shannon Shoap are sisters.[1] Mrs. Durrett is married to the victim, Ethan Durrett, while Ms. Shoap is married to Petitioner, Aaron Jarvis. Thus, Mr. Durrett and Petitioner are brothers-in-law.

In the very early morning hours of May 6, 2019, Mr. Durrett and Petitioner exchanged heated text messages because Petitioner borrowed their mother-in-law's vehicle but refused to return it. Shortly thereafter, the two met in the parking lot of the apartment complex where Petitioner lived, and they ended up in a physical altercation that resulted in Petitioner stabbing Mr. Durrett. Petitioner was charged with, among other crimes, attempted first- and second-degree murder and first-degree assault. At the close of his trial, Petitioner requested that the jury be instructed on both perfect and imperfect self-defense. The circuit court instructed the jury on perfect self-defense but declined to provide an instruction for imperfect self-defense.

The jury acquitted Petitioner of the attempted murder charges but convicted him of first-degree assault and other lesser-included offenses. For the first-degree assault conviction, Petitioner was sentenced to 15 years of incarceration, all but 10 years suspended, with five years of supervised probation. In an unreported opinion, the Appellate Court of Maryland held that the circuit court abused its discretion when it

---

[1] In its opening statement, the State incorrectly labeled Ms. Shoap as "Katie Durrett's sister-in-law[,]" but it later correctly noted that the two "are related to one another[;] they're sisters."

declined to instruct the jury on imperfect self-defense, given that the circuit court decided that there was enough evidence to instruct the jury on perfect self-defense.[2] But that error was, in the Appellate Court's view, harmless because the jury *acquitted* Petitioner of attempted first- and second-degree murder; even if the evidence had generated the imperfect self-defense instruction, a conviction of either of those charges would have required mitigating either of those convictions down to a conviction of attempted voluntary manslaughter.[3] While recognizing that, "from a sentencing perspective, a conviction of attempted voluntary manslaughter may sometimes be a better result for a defendant because it has a lower maximum sentence[,]" the Appellate Court nevertheless held that "an acquittal is a more favorable verdict than a mitigated conviction."[4]

We granted both the petition and the conditional cross-petition for certiorari to answer the following questions[5]:

---

[2] *Jarvis v. State*, No. 744, 2023 WL 4676989, at *2–3 (Md. App. Ct. July 21, 2023).

[3] *Id.* at *3.

[4] *Id.*

[5] As we customarily do, we have rephrased the questions presented. *See Woodlin v. State*, 484 Md. 253, 262 n.9 (2023). The State's original question in its conditional cross petition is: "Did the trial court properly decline to instruct the jury on imperfect self-defense?" Petitioner's original question presented is:

> Where Petitioner was acquitted of attempted murder but convicted of first-degree assault, did the Appellate Court err in holding harmless the trial court's erroneous refusal to instruct the jury on attempted voluntary manslaughter based on imperfect self-defense, notwithstanding that had Petitioner been convicted of attempted voluntary manslaughter rather than first-degree assault his sentence would be shorter?

2

1. Did the circuit court abuse its discretion in declining to instruct the jury on imperfect self-defense?

2. If the circuit court did abuse its discretion, then did the Appellate Court legally err in determining that the abuse of discretion was harmless?

For the reasons articulated below, we hold that the circuit court did not abuse its discretion in declining to instruct the jury on imperfect self-defense in this case. Because of that holding, we do not address the issue of harmless error.[6]

## II
## BACKGROUND

We begin by providing a brief overview of the law of self-defense before addressing the facts and procedural history.

### A.    *The Law of Self-Defense*

Maryland is among a minority of states that recognize both perfect and imperfect self-defense in criminal cases. *State v. Smullen*, 380 Md. 233, 251 (2004) ("Maryland recognizes two varieties of self-defense—the traditional one that we now call perfect or complete self-defense and a lesser form sometimes referred to as imperfect or partial self-defense."); L. Song Richardson & Phillip Atiba Goff, *Self-Defense and the Suspicion Heuristic*, 98 Iowa L. Rev. 293, 325 (2012) ("[O]nly a minority of jurisdictions recognize the doctrine of imperfect self-defense, although this number is growing." (footnote omitted)). Perfect self-defense requires the following:

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

---

[6] *See Baker v. State*, 332 Md. 542, 556 (1993) (declining to "reach the harmless error issue" because this Court found "no error" on the part of the circuit court).

3

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Porter v. State*, 455 Md. 220, 234–35 (2017) (emphasis and citation omitted). In addition, in the case of deadly force outside of one's home, an individual must make a reasonable effort to retreat before using such force. *Id.* at 235.

As its name suggests, perfect self-defense is a total defense to murder—and all lesser included offenses—and, if accepted by the trier of fact, necessitates an acquittal. *Id.*

Unlike perfect self-defense, imperfect self-defense is not a complete defense to the crime(s) charged. *State v. Faulkner*, 301 Md. 482, 486 (1984). Instead, imperfect self-defense modifies the first and fourth requirements of perfect self-defense (as articulated above). *See Porter*, 455 Md. at 235. Where perfect self-defense requires a defendant's subjective belief regarding imminent danger to be reasonable, imperfect self-defense obviates that requirement, mandating a defendant to show "that he [or she] actually believed that he [or she] was in danger, even if that belief was unreasonable." *Id.* (emphasis omitted). Furthermore, while perfect self-defense requires that the force used be objectively reasonable, imperfect self-defense allows for an unreasonable amount of force, so long as the defendant subjectively believed such force was necessary. *Id.* Lastly, in the case of deadly force used outside the home, to have acted in imperfect self-defense, a defendant "must have only 'subjectively believe[d] that retreat was not safe'—that belief

4

need not be reasonable." *Id.* (alteration in original) (quoting *Burch v. State*, 346 Md. 253, 284 (1997)). Thus, in summary, imperfect self-defense requires the defendant to show that he or she actually (i.e., subjectively) believed that: (1) he or she was in danger; (2) the amount of force he or she used was necessary; and (3) retreat was not safe. *Id.* Each of these beliefs can be unreasonable. *Id.*

In *Porter*, we explained that when a defendant accused of murder presents evidence of self-defense, a proper instruction enables the jury to reach one of three verdicts:

> (1) guilty of murder, if the jury concludes that "the defendant did not have a subjective belief that the use of deadly force was necessary," (2) not guilty, if the jury concludes "that the defendant had a reasonable subjective belief," [i.e., perfect self-defense]; and (3) guilty of voluntary manslaughter, if the jury concludes "that the defendant honestly believed that the use of force was necessary but that this subjective belief was unreasonable under the circumstances." [i.e., imperfect self-defense]

*Id.* at 236 (quoting *Faulkner*, 301 Md. at 500–01).

## B.    *Factual Background*

The recitation of facts is drawn from the trial testimony that occurred over February 26 and 27, 2020, before the Honorable J. Frederick Price (the "trial judge") in the Circuit Court for Cecil County. We first recount the uncontroverted testimony. We then discuss the underlying altercation between Petitioner and Mr. Durrett from the perspectives of (1) Mr. and Mrs. Durrett and (2) Petitioner.

Late on the night of May 5, 2019, Mrs. Durrett received a call from Ms. Shoap. While the topic of that phone conversation is unknown, the phone call prompted an exchange of text messages and a voice message between Mr. Durrett and Petitioner. Mr. Durrett initiated contact with the first text message on May 6, 2019, at 12:18 a.m.:

5

[Mr. Durrett]: Yo this is Ethan. I need you to do the right thing and take Patty's[7] car back .

[Mr. Durrett]: You have a new born at home dude and your wife is hysterically crying . Are you sick in the head dude ? Go there keep your mouth shut and love your family . Be thankful for what you have my dude. ..do the right thing please brother we don't need serious issues

[Petitioner]: Let have serious issues dawg

(All sic in original). At this point in the exchange, Petitioner sent to Mr. Durrett a recorded voice message that was sent as a text message.[8] The pertinent portions of the remainder of the text messages are as follows:

[Mr. Durrett]: Hey friend meet me in the back of wawa so we can chat.. out of respect for your wife and kid I know you would never want to cause attention or drama where there sleeping

[Mr. Durrett]: I'm on my way

[Petitioner]: Come to my [expletive] house bro.

[Petitioner]: There is no talking at all.

[Mr. Durrett]: That disrespectful and you could get kicked out be smart 0lease come to wawa

[Mr. Durrett]: Or walk across the street

[Mr. Durrett]: Or look il meet you out in that field away from the apartments

---

[7] Patty is Mr. Durrett and Petitioner's mother-in-law (Mrs. Durrett and Ms. Shoap's mother). Patty's last name is not referenced within the record, and we mean no disrespect by referring to her by her first name only. At the time, Petitioner was borrowing Patty's car but was refusing to return it.

[8] While the voice message is not entirely discernable, Petitioner clearly (1) asks Mr. Durrett if Mr. Durrett wants to have "serious [expletive] issues" (2) states "let's have serious [expletive] issues," and (3) tells Mr. Durrett to "mind [his] own [expletive] business." The entirety of the voice message is said in a passionate, upset tone.

[Petitioner]: Dude it's pitch black there are no cameras come to my house. Ain't no talkin or yelling..

(All sic in original).

Mrs. Durrett then drove herself and Mr. Durrett to Petitioner's residence, the Pine Hill Apartments ("Pine Hill"), located at 367 Fletchwood Road, Elkton, MD, near the Maryland-Delaware border. Pine Hill is an apartment complex that is situated between two parking lots. One lot, on the left, is an accessory lot and the other, on the right, wraps around the apartment buildings. When the Durretts arrived, they parked in the accessory parking lot, which they do not typically use when they visit Pine Hill. The encounter and altercation between Mr. Durrett and Petitioner lasted no more than one minute. The particulars vary markedly depending on whom you ask. We recount each version.

### 1. The Durretts' version of events

Upon arriving at the agreed upon location, Mrs. Durrett remained in the vehicle, which she kept running with the headlights on, while Mr. Durrett exited the vehicle and began walking towards the apartment buildings. Mr. Durrett noticed Petitioner standing roughly 20–30 feet ahead of him and heard Petitioner state, "Yo, mother [expletive]." Mr. Durrett turned his back to Petitioner and motioned for Petitioner to come towards Mr. Durrett so the two could have a discussion in a better-lit area and away from the apartment building so that Petitioner and his family could avoid getting kicked out of that complex. Mr. Durrett heard Petitioner's footsteps as he began running towards Mr. Durrett. Mr. Durrett turned around and "planted [his] feet" just in time for Petitioner to run into Mr.

7

Durrett "pretty fast and pretty hard[,]" with Petitioner wrapping his arms around Mr. Durrett in a hugging-like manner, stabbing him in his left lower back in the process.

In that moment, Mr. Durrett did not realize he had been stabbed; he simply felt "hot and adrenaline[,]" and believed that the knife's impact simply had been a punch. Petitioner's force was enough to knock Mr. Durrett to the ground with Petitioner landing on top of Mr. Durrett. At this point, Mr. Durrett felt a "throbbing" sensation and said to Petitioner, "Dude, you stabbed me, didn't you?" Petitioner replied, "Yeah, you mother [expletive], yes." The two continued to roll around, but the altercation eventually ended with the two in a stalemate, with Mr. Durrett lying on his right shoulder and Petitioner behind and on top of him. Petitioner dropped the knife, and Mr. Durrett began pushing Petitioner off him, punched Petitioner at least once, and was able to stand up. At this point, both individuals could see the blood from Mr. Durrett's injury. Mrs. Durrett, who witnessed the entire altercation, exited the vehicle and began running towards Mr. Durrett and Petitioner. Petitioner attempted to get up, but Mr. Durrett kicked him in the stomach. While on the ground, Petitioner stated "I'm sorry, I'm sorry, I didn't mean to."

### 2. Petitioner's version of events

Petitioner recalled the event quite differently. On May 5, Petitioner was working his typical work shift of 2:00/2:30 p.m.–10:45 p.m. Petitioner indicated that his wife, Ms. Shoap, was worried about what might have delayed his arrival home and that his lack of urgency in returning home sparked an argument between them. On his way home, he received the text messages from Mr. Durrett (previously recounted). While he thought that

8

Mr. Durrett's text messages were inappropriate and passive aggressive, he did not desire any sort of altercation with Mr. Durrett.

Upon arriving at Pine Hill, Petitioner did not see anyone else, and he parked his car in the accessory parking lot. Although the accessory parking lot is further away from the apartment buildings, Petitioner wanted to avoid any sort of conflict with Mr. Durrett, as visitors generally would park in the lot that is closer to, and wraps around, the apartment buildings. Petitioner exited his vehicle, locked the vehicle door, turned around, and saw Mr. Durrett, who was waiting for him and motioned for Petitioner to go over to a field behind the apartment buildings. At this point, Petitioner made a few observations: Mrs. Durrett's car was parked in the accessory parking lot, Mr. Durrett appeared to be "sweating profusely[,]" and Mr. Durrett was being "aggressive in his movements." Petitioner attempted to avoid Mr. Durrett by going around the other side of other parked vehicles because Petitioner "didn't want any issues with [Mr. Durrett]" and "wanted to go home."

Mr. Durrett followed Petitioner and cut him off, prompting Petitioner—out of fear—to raise his voice and yell in an attempt to draw attention to the two. When that tactic failed, Petitioner flicked open and brandished a knife that he carried for work on his utility belt, hoping that Mr. Durrett would see it. Mr. Durrett eventually positioned himself within "swinging distance" of Petitioner and attempted to punch Petitioner. Petitioner "ducked in the nick of time[]" and "proceeded to grab [Mr. Durrett] because [Petitioner] didn't want [Mr. Durrett] to keep swinging at [Petitioner,]" as Mr. Durrett is "much larger than [Petitioner]."

9

After Petitioner grabbed Mr. Durrett, the two went to the ground. Petitioner was not aware at that moment that he had stabbed Mr. Durrett, nor did he intend to stab Mr. Durrett. The two were side-by-side on the ground; when Mr. Durrett realized he had been stabbed, he began wrestling with Petitioner for control of the knife. Meanwhile, Petitioner was fearful that Mr. Durrett would take possession of the knife and retaliate. Petitioner eventually let go of and threw the knife, and Mr. Durrett then "beat [Petitioner's] head into the asphalt[,]" kicking and punching Petitioner several times. At some point during the confrontation, Petitioner saw out of his peripheral vision Mrs. Durrett "pull[] out of the parking lot[]" and travel "up the other side of the development." By the end of the roughly 60-second altercation, Mrs. Durrett had returned and attempted to pull Mr. Durrett off Petitioner because Mr. Durrett was "bouncing [Petitioner's] head off of the asphalt."

When Mr. Durrett relayed to Mrs. Durrett that he had been stabbed, Petitioner stated that he "didn't mean for it to happen. [He] didn't mean for [Mr. Durrett] to be wounded or to get stabbed, to get hurt." Even during his direct examination, Petitioner still was unsure how exactly the stabbing occurred, but he acknowledged that the knife was in his own hand when it did. He confirmed that he had no intent to kill Mr. Durrett and that he was not waiting for Mr. Durrett in the accessory parking lot.

\*   \*   \*

The Durretts returned to their vehicle and sought medical attention for Mr. Durrett's injury. Mr. Durrett eventually was treated at a hospital in Newark, Delaware. A few days later, Petitioner was arrested in Delaware and extradited to Maryland where he faced a five-

10

count indictment: (I) attempted first-degree murder, (II) attempted second-degree murder, (III) first-degree assault, (IV) second-degree assault, and (V) reckless endangerment.

## C.    *Procedural History*

### 1. The Circuit Court for Cecil County

After the close of all the evidence, while discussing the verdict sheet and jury instructions, Petitioner's trial counsel requested instructions for perfect and imperfect self-defense (MPJI-Cr 5:07 and 4:17.4).[9]  As to perfect self-defense, defense counsel stated that Petitioner "testified that he got the knife out because he was afraid of Mr. Durrett . . . and he was trying to keep [Mr. Durrett] away from him."  Concerning imperfect self-defense, defense counsel further proffered that, even if Petitioner's belief was not reasonable, "if the jury would believe that [Petitioner] believed that he was entitled to pull the knife out to protect himself, he's entitled to an imperfect self-defense instruction."  The State argued that the defense had not generated enough evidence for either the perfect or imperfect self-defense instruction and argued that both requests should be rejected.  The trial judge granted Petitioner's request for the perfect self-defense instruction but denied his request for the imperfect self-defense instruction; the trial judge gave no explanation for why he granted the former request but denied the latter.  After the trial judge instructed the jury and just before closing arguments, defense counsel renewed his request for the imperfect self-defense instruction, which the trial judge "noted" and ultimately denied (by not so instructing the jury).

---

[9] The State and Petitioner also submitted written requests for jury instructions. Petitioner specifically requested an instruction on both perfect and imperfect self-defense.

11

The jury acquitted Petitioner on the attempted murder charges, but it convicted him of first- and second-degree assault, as well as reckless endangerment. For his first-degree assault conviction, the Honorable V. Michael Whelan[10] sentenced Petitioner to 15 years of incarceration, all but 10 years suspended, with five years of supervised probation. Petitioner timely appealed his convictions.

## 2. The Appellate Court of Maryland

Pertinent to this appeal, Petitioner asked the Appellate Court whether the trial judge erred in refusing to instruct the jury on imperfect self-defense. *Jarvis v. State*, No. 744, 2023 WL 4676989, at *1 (Md. App. Ct. July 21, 2023).[11] The Appellate Court recognized that the trial judge did not provide an explanation for granting the request for an instruction on perfect self-defense but not imperfect self-defense. *Id.* at *2. And the court further recognized that it would be difficult "to imagine a situation where a defendant would be able to produce sufficient evidence to generate a jury issue as to perfect self[-]defense but not as to imperfect self[-]defense." *Id.* (alterations in original) (quoting *Faulkner*, 301 Md. at 502). Because "the existence of a belief is all imperfect self-defense requires, it will almost always be generated whenever perfect self-defense is generated." *Id.*

---

[10] Although Judge Price had been sitting as a Senior Judge since April 2009, pursuant to the Maryland Constitution, Article IV, § 3A, he voluntarily removed himself from recall status in the first half of September 2020, before Petitioner's sentencing hearing. Thus, Judge Whelan sentenced Petitioner.

[11] Petitioner also received two concurrent five-year sentences for his other convictions: one for second-degree assault, and one for reckless endangerment. On appeal, the Appellate Court, recognizing that those convictions merged for sentencing purposes with the conviction for first-degree assault, vacated the sentences for both lesser included offenses. *Jarvis*, 2023 WL 4676989, at *3–4. That issue is not before us.

12

Viewing the evidence in the light most favorable to Petitioner, the Appellate Court stated that Petitioner did not want to fight Mr. Durrett and brought out his knife to deter conflict, and that Mr. Durrett was both physically bigger than Petitioner and threw the first punch. *Id.* at \*3. The Appellate Court reasoned that, because the trial judge found this evidence sufficient to generate an instruction for perfect self-defense, the trial judge "necessarily found that the reasonableness of [Petitioner's] belief was at issue. According to the Appellate Court, because the existence of [Petitioner's] belief was thus also at issue, the trial [judge] abused [his] discretion by not also giving the imperfect self-defense instruction." *Id.* Nevertheless, the Appellate Court held that this error was harmless and affirmed Petitioner's convictions. *Id.*

### III
### STANDARD OF REVIEW

At the request of either party, the trial court shall "instruct the jury as to the applicable law and the extent to which the instructions are binding[,]" but the trial court need not "grant a requested instruction if the matter is fairly covered by [other] instructions[.]" Md. Rule 4-325(c). In other words, a requested jury instruction is required when (1) it "is a correct statement of the law;" (2) it "is applicable under the facts of the case;" and (3) its contents were "not fairly covered elsewhere in the jury instruction[s] actually given." *Rainey v. State*, 480 Md. 230, 255 (2022) (quoting *Ware v. State*, 348 Md. 19, 58 (1997)).

To assign error to a trial court's refusal to give a particular jury instruction, the aggrieved party must lodge an on-the-record objection "promptly after the court instructs

13

the jury, stating distinctly the matter to which the party objects and the grounds of the objection." Md. Rule 4-325(f).  On appeal, we review the overall decision of the trial court for an abuse of discretion, but the second requirement (whether the instruction is applicable in that case) is akin to assessing the sufficiency of the evidence, which requires a *de novo* review.  *Rainey*, 480 Md. at 255.

In assessing whether a particular jury instruction is applicable under the facts of a given case, a defendant must, as an initial matter, "produce 'some evidence' sufficient to raise the jury issue." *Arthur v. State*, 420 Md. 512, 525 (2011).  In the realm of self-defense, the defendant, thus, bears the initial burden of "producing 'some evidence' on the issue of mitigation or self-defense" to entitle him or her to a jury instruction.  *Dykes v. State*, 319 Md. 206, 215 (1990) (quoting *Simmons v. State*, 313 Md. 33, 40 (1988)).  The defendant must meet this burden as to each element of the defense, though we have consistently held that this burden is a "fairly low hurdle[.]"  *Arthur*, 420 Md. at 526.  Indeed, the "some evidence" standard need not even rise to the level of a preponderance.  *State v. Martin*, 329 Md. 351, 359 (1993).  And because whether "some evidence" exists is viewed in the light most favorable to the requesting party, *Rainey*, 480 Md. at 268, both the source of that evidence and its weight compared to the other evidence presented at trial are immaterial, *Martin*, 329 Md. at 359.

## IV
## ANALYSIS

We begin by summarizing the parties' contentions before moving to our own analysis of the evidence in this case.

14

Petitioner argues that the trial judge "correctly instructed the jury on perfect self-defense[]" but erred when he declined to instruct the jury on imperfect self-defense. Petitioner contends that "[w]hen the evidence is viewed in the light most favorable to [him], it is clear that he has met his burden of establishing the minimal quantum of evidence necessary to generate the [imperfect self-defense] instruction." In support of that contention, he cites to his own testimony, which, he asserts, reveals the following:

- Mr. Durrett is a strong individual who is physically bigger than Petitioner;

- Petitioner feared Mr. Durrett and wanted to avoid confrontation with him;

- Mr. Durrett sought out Petitioner and cut off Petitioner's route home; and

- Petitioner utilized various tactics to avoid confrontation, such as yelling and trying to draw attention to the two, as well as brandishing a knife.

Based on that evidence, Petitioner asserts that, had the trial judge given the imperfect self-defense instruction, "a reasonable jury could have found that [he] had a subjective actual belief that his life was in danger and that he had to react as he did, even though the jury [ultimately] may have determined that his beliefs were unreasonable."

The State doubles down on the other side: not only did the trial judge *not err* in refusing to instruct the jury on imperfect self-defense, but the trial judge *committed error* when he instructed the jury on perfect self-defense. Thus, according to the State, Petitioner "actually received more—not less—than he was entitled to in terms of instructions." Regarding imperfect self-defense, the State believes that Petitioner did not present *any* evidence that he both "*actually believed* [that] he was in imminent or immediate danger of

15

death or serious bodily harm" and "*actually believed* that his use of deadly force was necessary in response to such danger."

We agree with the State that Petitioner did not meet his burden to produce "some evidence" to generate the imperfect self-defense instruction.

Cabining our review solely to the imperfect self-defense instruction, neither party introduced any evidence that Petitioner subjectively believed that stabbing Mr. Durrett was necessary to avoid imminent bodily injury.[12] Reviewing Petitioner's testimony in the light most favorable to him and accepting it as true, Petitioner undercuts the essence of a self-defense theory: that the act in question deliberately was done for self-defense purposes. Petitioner did not testify at trial that he used deadly force against Mr. Durrett because he subjectively believed doing so was necessary for his safety, nor did he assert that in any pretrial statement that was introduced at trial. And while circumstantial evidence and reasonable inferences drawn therefrom can satisfy the "some evidence" standard, *see Martin*, 329 Md. at 363, we disagree that the evidence in this case, even when viewed in the light most favorable to Petitioner, satisfied the requisite threshold.

As we have explained, a defendant's state of mind "must be determined by a consideration of his [or her] acts, conduct and words" but "[o]rdinarily," the source of that evidence "will be testimony by the defendant." *Martin*, 329 Md. at 361, 363 (cleaned up).

---

[12] While we recognize that, to properly generate the imperfect self-defense instruction, Petitioner needed to point to some evidence to satisfy all elements of imperfect self-defense, *see Arthur*, 420 Md. at 525; *Dykes*, 319 Md. at 215, because we hold that there was no evidence as to Petitioner's subjective belief that his use of force was necessary, we need not address, and intimate no opinion on, any other element of imperfect self-defense.

Here, Petitioner testified that he intentionally *tackled* Mr. Durrett but that he never—at any point—actively tried to stab Mr. Durrett. He admitted that, when both he and Mr. Durrett went to the ground, he had no idea that Mr. Durrett had been stabbed. After Mr. Durrett told Mrs. Durrett that he had been stabbed, Petitioner testified that he told the Durretts that he did not intend for Mr. Durrett to "get hurt[,]" "be wounded[,]" or "get stabbed[;]" he simply "didn't mean for it to happen." When asked during his direct examination how Mr. Durrett "g[o]t stabbed," Petitioner replied, "I honestly couldn't tell you."

The Durretts' testimony similarly reflects the absence of any evidence that Petitioner maintained a subjective belief that stabbing Mr. Durrett was necessary for Petitioner's safety. Mr. Durrett testified that, during the altercation, he stated to Petitioner, "[Y]ou stabbed me didn't you?" to which Petitioner replied, according to Mr. Durrett, "Yeah, mother [expletive], yes." The jury could certainly infer from that statement from Petitioner (as recounted by Mr. Durrett) that Petitioner intentionally stabbed Mr. Durrett. But rather than establish that Petitioner acted under a belief that stabbing Mr. Durrett was an appropriate use of force in response to a threat, Mr. Durrett testified that Petitioner's use of deadly force was unprovoked and that Petitioner was the initial aggressor.

There were thus two accounts of the events leading up to Petitioner stabbing Mr. Durrett. Under one, the stabbing was accidental. Under the other, the stabbing was intentional and unprovoked. Neither account contains any evidence that Petitioner possessed a subjective belief that stabbing Mr. Durrett was necessary for Petitioner's protection. In the first account, the stabbing was not necessary at all. In the second, it was necessary to carry out Petitioner's desire to harm Mr. Durrett, not to protect Petitioner. Nor

17

would it be appropriate to combine individual, out-of-context portions of the two accounts to cobble together an inference that is inconsistent with both of them. While the "in the light most favorable" standard requires that the evidence and proper inferences be drawn in Petitioner's favor, that standard "does not require 'the taking of isolated sentences, or parts of sentences, in the testimony and construing them out of context, without any regard

to the rest of the witness's testimony.'"[13] *Rodriguez v. Lynch*, 246 Md. 623, 626 (1967)

(quoting *Gatling v. Sampson*, 242 Md. 173, 182 (1966)).[14]

---

[13] Petitioner contends that the "jury was [not] required to accept [his] testimony that he had not been trying to stab [Mr.] Durrett and that he did not immediately know he had stabbed him." While Petitioner is correct that the jury could reject his testimony, *see In re Gloria H.*, 410 Md. 562, 577 (2009), that does not obliviate his burden of pointing to "some evidence" establishing that he subjectively believed stabbing Mr. Durrett was necessary for his safety, *see Dykes*, 319 Md. at 217 ("If there is any evidence relied on by the defendant which, *if believed*, would support his claim he acted in self-defense, the defendant has met his burden[]" of producing "some evidence") (emphasis added).

In a related vein, the Dissent points out that by finding Petitioner guilty of first-degree assault, which requires an "intentional or reckless act[,]" the jury found that the stabbing was not accidental. Dissent Op. at 13. Thus, the Dissent believes, "the jury evidently did not find credible [Petitioner's] testimony that he did not intend to stab Mr. Durrett or that the stabbing was accidental." *Id.* We agree that the jury must have rejected Petitioner's contention that the stabbing was unintentional. But that is irrelevant because the only other account the jury heard was that the stabbing was intentional, but not for protection. A court is required to give a jury instruction when, among other things that are not at issue here, there is "some evidence" to support each element of the defense. *McMillan v. State*, 428 Md. 333, 355 (2012). Even viewed in the light most favorable to Petitioner, there was no evidence that he subjectively believed stabbing Mr. Durrett was necessary for his safety. That the jury discredited Petitioner's testimony that the stabbing was an accident is not relevant to whether the trial court erred in declining to provide the imperfect self-defense jury instruction in the first place. At the time a trial judge must decide to give a jury instruction, the trial judge is not aided by the jury's weighing of the evidence. Indeed, the trial judge is explicitly required not to weigh the evidence. *Dykes*, 319 Md. at 217 ("It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary."). It was Petitioner's burden to produce "some evidence" and we hold that he failed to do so.

[14] Our remarks in *Rodriguez* about the "in the light most favorable" standard arose in the context of reviewing a trial judge's grant of a directed verdict in a civil case. 246 Md. at 623. The issue, we stated, was "whether the evidence considered in a light most favorable to Rodriguez *together with the proper and legitimate inferences to be drawn therefrom* is sufficient to establish a prima facie case of primary negligence on the part of Lynch." *Id.* (emphasis added) (citation omitted). While we have not made similar remarks in the criminal context when using the "in the light most favorable" standard, say, when reviewing the sufficiency of the evidence for a criminal conviction, there is no reason to assume that the standard should be treated any differently when applied either in a civil or criminal case.

In neither account, then, is there any evidence that Petitioner subjectively believed that the amount of force he used was necessary for his protection. As we have explained, "[a]lthough as a legal matter there is no bar to putting forth different or inconsistent theories of defense [e.g., accident and self-defense], there will often be practical problems of proof, particularly where different theories involve proof of different mental states on the part of the defendant." *Sims v. State*, 319 Md. 540, 550–51 (1990). Here, Petitioner ran into these "practical problems of proof[.]" *Id.* at 551. It becomes extremely difficult for a defendant to produce "some evidence" that he or she subjectively believed using deadly force was necessary to protect themselves, when the defendant testifies that the use of deadly force was accidental only. *Cf. id.* at 554–55 ("The issue in this instance involved the honestly held subjective feelings of the perpetrator at the moment of the shooting. When the defendant maintains that he was not the perpetrator, this becomes a very difficult, though probably not impossible, burden to meet." (footnote omitted)). In other words, we have difficulty inferring that Petitioner subjectively believed that his use of deadly force (the knife) was necessary where the evidence from him shows that he never intended to use that very same deadly force and the evidence from the victim shows that his use of force was intentional, but as the unprovoked aggressor.[15] *See Porter*, 455 Md. at 235 (noting that the defendant must have "actually believed the amount of force used was necessary[]" (emphasis omitted)); *see also Selby v. State*, 361 Md. 319, 332 (2000) (noting that voluntary manslaughter is an *intentional* homicide).

---

[15] It is undisputed that use of a knife constitutes the use of deadly force. *See, e.g.*, *Lambert v. State*, 70 Md. App. 83, 88, 92, *cert. denied*, 309 Md. 605 (1987).

*Roach v. State*, 358 Md. 418 (2000), illustrates this issue well. In *Roach*, we were asked "whether [the defendant] was entitled to a voluntary manslaughter instruction based upon a theory of imperfect self-defense." 358 Md. at 421. And like the trial judge here, the circuit court in *Roach* instructed the jury on perfect self-defense but not imperfect self-defense. *Id.* at 425. Roach was charged with shooting and murdering another individual, Bunn. *Id.* at 421–22. At trial, Roach maintained that the shooting was an accident. *Id.* at 423–24. The State, however, introduced into evidence four pretrial statements that Roach made to the police. *Id.* at 422. In the first, second, and fourth statements, Roach never recounted any details regarding the shooting; he specifically claimed in his first statement that he was unaware of who shot Bunn, did not own a gun, and only heard the gunshots from across the street. *Id.* at 422–23.

In the third statement, however, Roach indicated that he and a third party began arguing and fighting over a $5 debt. *Id.* at 422. Bunn, a friend of the third party, joined the altercation and began fighting with Roach. *Id.* According to Roach, Bunn

> came straight to me and start[ed] beating [me] to the ground so I seen the gun on the ground and [Bunn] seen the gun so I thought that he was going to kill me right there on scene but I got the gun from him and we was fighting for the gun until somebody said the Police is in the store so he didn't care if the Police was in the store so I hit him with the gun and he start[ed] going across the street me and him so we start fighting again and because of him been drunk he fell over the curb and tried to take the gun and I shot him but I didn't want to because I thought he was going to tried to do something to me . . . . When I picked up the gun, [Bunn] grabbed me. Vito yelled "hit him!" [Bunn] rushed me. I hit him with the gun. We kept struggling. We both continued struggling. We were across the street (George Palmer Highway). He fell at the curb in the parking lot of the Belle Haven Apartments. He tried to get up. I shot him.

*Id.* at 422–23. Roach later admitted in that statement that he owned the gun. *Id.* at 423.

21

The Appellate Court concluded that the trial court correctly declined to provide the imperfect self-defense instruction, explaining that Roach could "not have believed that he was using a level of force necessary to defend himself by shooting the victim, because, as he testified, he did not know the victim had been shot." *Id.* at 425 (footnote and internal quotations omitted). We reversed that decision, noting that Roach's third statement "constituted some evidence of self-defense . . . sufficient to generate the issue." *Id.* at 432. Even though Roach testified at trial that the shooting was an accident, we noted that a defendant is entitled to any instruction that is "fairly supported by the evidence, even if several theories offered are inconsistent." *Id.* (quoting *Sims v. State*, 319 Md. 540, 550 (1990)).

Like Roach, Petitioner was free to pursue alternative, and even inconsistent, defense theories (accident and self-defense). Also, like Roach, Petitioner's testimony at trial sounded solely in accident, in that he disclaimed ever intentionally using the knife. *See id.* at 423–24, 432. But *Roach* is distinguishable because there, unlike in Petitioner's case, Roach's pretrial statement that he intentionally shot the victim in self-defense was introduced into evidence. For that reason, coupled with the rest of the relevant evidence, we were able to infer that Roach subjectively believed shooting the victim was necessary for his safety. This distinction is critical. Unlike Roach, there was no other evidence here that supported the theory that Petitioner intentionally stabbed Mr. Durrett *because* Petitioner subjectively believed that such deadly force was necessary. *See id.* at 432. Regarding that belief, the jury heard from Petitioner that Petitioner never intentionally used that deadly force against Mr. Durrett, and from Mr. Durrett that the use of force was

22

intentional but unprovoked. That distinction is critical because by its very nature, imperfect self-defense relates to an intentional or knowing use of force that is for protection, not an accidental stabbing or an unprovoked stabbing. Testimony that an action was accidental—alone—cannot be used to support the theory that the action was both an accident and intentionally done in self-defense. *See id.* Such testimony does not meet the "minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to *rationally* conclude that the evidence supports the application of the legal theory desired." *Dishman v. State*, 352 Md. 279, 292 (1998) (second emphasis added).[16]

Petitioner contends that the record contained "some evidence" that he subjectively believed stabbing Mr. Durrett was necessary for his safety, namely the following circumstantial evidence: (1) Mr. Durrett played high school football and was physically bigger than Petitioner; (2) Mr. Durrett sought out Petitioner late at night, approached him from behind, and cut off his path home; (3) Petitioner was afraid of Mr. Durrett so he began

---

[16] We agree with the Dissent that the "some evidence" required to generate a self-defense instruction (of either variety) need not come from a source other than the defendant. Dissent Op. at 12, 17 n.6. But whatever the source of that "some evidence" is, it must adequately and sufficiently satisfy the elements of self-defense. Petitioner's testimony did not meet that threshold. His testimony regarding the requirement that he subjectively believe his use of force was necessary was—by all accounts—nonexistent because he did not intend to use such force. In *this case*, therefore, Petitioner did need alternative evidence to satisfy the elements of self-defense, much like Roach's third statement served that very purpose. *See Roach*, 358 Md. at 432.

Petitioner also argues that, at trial, the State focused its argument against generating the imperfect self-defense instruction on the lack of evidence concerning the *reasonableness* of the force used by Petitioner, not that Petitioner never intended to use the force at all. But the State's theory of the case at trial always aligned with the Durretts' version of events: that Petitioner was the unprovoked, initial aggressor. Naturally then, the State would never have argued at trial that Petitioner did not intend to use the knife and that the stabbing was an accident.

yelling to draw attention to the two and then brandished his knife; and (4) Mr. Durrett threw the first punch, Petitioner ducked it, and then grabbed or quick hugged Mr. Durrett, with the pocketknife in his hand, because he did not want Mr. Durrett to keep swinging at him. The Dissent makes a similar argument. Dissent Op. at 6–9.

Even when viewed in the light most favorable to Petitioner, this circumstantial evidence does not amount to "some evidence" that Petitioner subjectively believed stabbing Mr. Durrett was necessary for his safety. Indeed, Petitioner testified that he thought it was necessary to "*grab*" Mr. Durrett to avoid being punched, not that he thought it was necessary to *stab* Mr. Durrett to avoid death or serious bodily injury. (Emphasis added). In other words, Petitioner specifically testified that he thought it was necessary to use non-deadly force (grabbing Mr. Durrett), not that he thought it was necessary to use deadly force (stabbing Mr. Durrett).[17] Like his testimony that the stabbing was an accident, Petitioner's own testimony negated the possibility that he felt it necessary to use a deadly weapon to defend himself. *See Lambert v. State*, 70 Md. App. 83, 98 & n.2 (1987) (holding that, defendant claiming that, "not realizing the knife was in his hand, he punched the victim in 'self-defense[]'" but failing to state that he "felt it necessary to stab the victim to

___

[17] The Dissent finds it "telling[]" that Petitioner thought it was necessary for his safety to "quick hug[]" Mr. Durrett after Mr. Durrett attempted to punch him. Dissent Op. at 9. Petitioner testified that he "grab[bed Mr. Durrett] because [he] didn't want [Mr. Durrett] to keep swinging at" him. The knife was in Petitioner's hand at this time. That Petitioner believed it was necessary to "grab[]" or "quick hug" Mr. Durrett for his safety, however, is not the same thing as Petitioner believing that *stabbing* Mr. Durrett was necessary for his safety. Quite the opposite, by testifying that he thought "grab[bing]" Mr. Durrett was necessary for his safety, Petitioner actually undermines his argument that he thought stabbing Mr. Durrett was necessary for his safety.

24

defend himself[,]" the defendant's "own testimony negated the possibility he felt it necessary to use a deadly weapon[]"). As the Appellate Court explained in *Lambert*, "[w]hile someone in [Petitioner's] position might have entertained an honest but unreasonable belief that he [or she] needed to use deadly force to defend him[ or herself], the evidence furnishes no indication that [Petitioner] did, in fact, so believe." *Id.* at 99.

Petitioner relies on our decision in *Martin* to support his argument that there was ample circumstantial evidence from which the jury could infer that he acted in self-defense. There, the trial court declined to give an imperfect self-defense instruction, and the defendant was convicted of first-degree murder. *Martin*, 329 Md. at 353. The defendant did not deny firing the fatal shot, but he claimed he had no recollection of the incident because he was under the influence of alcohol and marijuana. *Id.* at 355, 362. On appeal, the defendant argued that the trial court erred in declining to provide an imperfect self-defense jury instruction. *Id.* at 353–54. The issue before the Court was whether evidence of the defendant's state of mind at a prior encounter with the victim could be used to show the defendant's state of mind at the time of the shooting, which occurred later that same day.[18] *See id.* at 359–68.

Evidence with respect to the first encounter, we noted, "was rather detailed and it focused on [Martin's] acts, conduct[,] and words." *Id.* at 363. That evidence was that the defendant and victim had a verbal argument, the victim told the defendant to leave the area and "don't come back unless I tell you can" and that if the defendant did come back "it

---

[18] The opinion is unclear on the exact timing of the two encounters. *Martin*, 329 Md. at 354–55.

25

would be [the victim] kicking [the defendant's] ass[.]" *Id.* at 354. The victim followed the defendant briefly as the defendant left the area. *Id.* Based on this evidence, we concluded that we could "arguably" infer that the defendant was then fearful of the victim. *Id.* at 364.

On the other hand, we concluded that there was no direct or circumstantial evidence of the defendant's state of mind at the time of the second encounter which would allow us to infer that the defendant acted in self-defense. *Id.* Because the victim died and the defendant testified that he could not remember the incident due to his intoxication, the sole evidence was testimony from the victim's friend who was with the victim immediately prior to the shooting. *Id.* That evidence was that the victim spotted the defendant in his car, told his friend he was going to see what the defendant was doing there, and walked to the car "carrying a beer cup in one hand and a 'party ball'[19] in the other." *Id.* 354–55. The victim's friend then recounted that he heard a gunshot, saw the victim falling, and saw the defendant drive off in his car. *Id.* at 355. We rejected Martin's attempt to extrapolate the evidence regarding his state of mind from the first encounter onto the second, stating that "[because] it is [Martin's] subjective belief *at the moment that the fatal shot is fired* that is relevant and probative, evidence of a prior mental state will not suffice." *Id.* at 365 (emphasis added). We concluded that because evidence pertaining to the second encounter "provided no details of, or insight into, the circumstances of the shooting from the [defendant's] perspective, his acts, his words, his conduct, there was nothing from which to draw an inference as to what the [defendant] subjectively believed or felt when he fired

---

[19] The Court described a "party ball" as "a ball-shaped object made of plastic, designed to hold three gallons of beer." *Id.* at 355 n.2.

26

the fatal shot." *Id.* at 364. Accordingly, we held that the trial court did not err in declining to give the imperfect self-defense instruction. *Id.* at 368.

Petitioner argues that the "evidence of the circumstances existing at the time of the stabbing from Petitioner's perspective is far more detailed than what the Court found 'detailed,' 'focused,' and descriptive of Martin's mental state during the first encounter [with the victim]." We do not disagree with that statement, but it does not aid Petitioner because those circumstances did not give rise to an inference that Petitioner held a subjective belief that his use of deadly force was necessary. We did not hold in *Martin* that when there is detailed evidence that can aid in divining a defendant's state of mind, a court must automatically give an imperfect self-defense jury instruction. Every case will have different evidence, and no matter how detailed the pertinent testimony may be, a court must make an independent evaluation of the admissible evidence in determining whether to provide a requested jury instruction. Here, in the light most favorable to Petitioner, there was, at most, evidence that he had a fear of Mr. Durrett as to which he thought a proportional response was lunging at and grabbing Mr. Durrett. There was no evidence that Mr. Durrett had a propensity for violence, was armed, pulled a gun on Petitioner, or had brutally attacked Petitioner before. *Compare Gunther v. Maryland*, 228 Md. 404 (1962) (defendant knew that the victim had severely beaten his sister on multiple occasions, "always" carried a gun, and had previously threatened to shoot someone, so when victim unexpectedly jumped into defendant's car and raised his hand, defendant assumed victim

27

had a gun),[20] *with Roach*, 358 Md. at 422–23 (evidence indicated that victim and defendant were fighting over possession of a gun, defendant thought victim "was going to kill [him] right there on scene[,]" so defendant shot victim when victim tried to take the gun), *and Wilson v. State*, 422 Md. 533, 543 (2011) (victim pulled a gun on the defendant which defendant perceived as a "[k]ill or be killed[]" situation). We simply do not have that kind of evidence in this case.

Finding no support in the totality of the circumstantial evidence just discussed, Petitioner contends that the altercation with Mr. Durrett all happened "very quickly," so "it would be reasonable for the jury to perceive the intentional conduct of threatening use of force by (brandishing the knife) and the stabbing []as one continuous act." In support of his argument, Petitioner cites *State v. Gomaz*, 414 N.W.2d 626 (Wisc. 1987).

_____

[20] Although not an argument made in his brief, at oral argument, Petitioner's counsel pointed us to *Gunther v. Maryland*, 228 Md. 404 (1962) as the best case on inferring subjective beliefs in the self-defense context. In *Gunther*, the defendant was convicted of second-degree murder after shooting his brother-in-law. *Id.* at 406. The defendant admitted to the killing but claimed that he acted in self-defense. *Id.* The shooting occurred when the defendant dropped off his sister, the victim then re-opened the car door and "jumped in on" the defendant and raised his hand. *Id.* at 407. The defendant admitted that he reached for a rifle on his back seat and shot his brother-in-law. *Id.* Relevant circumstantial evidence that allowed us to infer that there was "some evidence" that the defendant acted in self-defense included: the defendant was aware that the victim had severely beaten his sister on multiple occasions (including the day before the shooting), the victim "always" carried a gun and had previously threatened to kill his sister using it, and that, at the time of the killing, the defendant could not tell whether the victim had the gun or not but assumed he did. *Id.* at 407. The defendant made no claim of accident.

*Gunther* is distinguishable because there, unlike here, the defendant did not claim the shooting was accidental, and he possessed knowledge of the victim's violent propensity and the fact that he was "always" armed with a gun and had previously threatened to kill his sister using it. Here, Petitioner claimed that the shooting was accidental and there was no evidence that Mr. Durrett had a dangerous propensity, was "always" armed with a gun, had previously threatened to shoot someone, or anything of that nature.

28

In *Gomaz*, the defendant killed the victim using a knife and was charged with first-degree murder. 414 N.W.2d at 628. The "defendant admitted that she intentionally threatened the use of self-defense, did not deny that [the victim] died as a result of a stab wound from the knife that she wielded, but she claimed that she did not intentionally thrust the knife into the deceased." *Id.* at 631. The trial court gave a perfect self-defense instruction but not an imperfect self-defense or manslaughter instruction. *Id.* at 629. The defendant was convicted of first-degree murder and appealed her conviction on the basis that she was entitled to an imperfect self-defense jury instruction. *Id.* at 627–28. On appeal, the State essentially argued that the defendant was not entitled to self-defense instruction of either kind because "self-defense is premised upon an intentional act, [so] an assertion of accidental or unintentional killing is inconsistent with a claim that use of force is necessary for self-defense." *Id.* at 629. The Supreme Court of Wisconsin disagreed, stating that it would not split hairs between "the intentional conduct of threatening use of force from the ultimate unintentional act resulting from the actions taken in self-defense" because such an exercise would "create an inconsistency [that] would . . . impose a fictional distinction upon what was essentially one continuous act." *Id.* at 631. Accordingly, the court concluded that the defendant was entitled to an imperfect self-defense instruction and remanded the case to the circuit court for a new trial. *Id.* at 636.

*Gomaz* is not applicable because we previously have rejected the rationale underpinning it. In *Martin*, we stated that "intent and a subjective belief of imminent peril are not identical." 329 Md. at 363. Circumstantial evidence tending to prove intent does not necessarily also tend to prove a subjective belief of imminent danger because

29

> [w]hat one intends to do and what one believes, even as the precipitating predicate for one's intent, are entirely separate and distinct states of mind. A defendant may intend to kill the victim, but only because he or she honestly believes that he or she is in imminent danger of death or serious bodily injury, which can only be avoided by the use of force.

*Id.* *Gomaz*, thus, rejects what *Martin* explicitly embraces: the distinction between state of mind as to imminent danger and one's intent to use force. *Gomaz* blurs the distinction that this Court recognized by ignoring the very real possibility that some individuals may threaten force, hoping to deter a potential attacker, while concurrently never intending to use that threatened force. Indeed, the evidence in this case shows that is essentially what occurred here, at least according to Petitioner. Petitioner testified that he brandished the knife in order to deter a confrontation, explaining that he "flicked the knife open just to brandish it, just hoping that [Mr. Durrett] would see it[,]" *not* because he actually believed that stabbing Mr. Durrett was necessary to protect himself from death or serious bodily injury. It should go without saying that brandishing a knife in hopes of deterring conflict is not the same thing as actively using that knife to stab someone because of a subjective belief that doing so is necessary for one's safety.

*Gomaz* also is distinguishable for another reason: it involved a request for a jury instruction based on a Wisconsin self-defense statute, which stated that a "person is privileged to *threaten* or intentionally use force against another[,]" and that the person "may intentionally use only such force or *threat thereof* as he reasonably believes is necessary[.]" *Gomaz*, 414 N.W.2d at 630 n.4 (quoting § 939.48) (emphasis added).[21]

---

[21] In its entirety, the statute provided:

30

Maryland does not have a similar statute, and our case law has consistently focused solely on the "use" of force as opposed to "threat" thereof. *See, e.g.*, *Porter*, 455 Md. at 234–36 (providing a detailed overview of both the perfect and imperfect self-defense elements in Maryland and referring solely to the "use" of force).

We conclude that the record shows that there was *no* evidence that Petitioner subjectively believed his use of deadly force was necessary for his safety. We, therefore, hold that the trial judge did not err in declining to instruct the jury on imperfect self-defense.

**V**
**CONCLUSION**

Petitioner was free to argue to the jury that the stabbing of Mr. Durrett was both an accident and intentionally done in self-defense. But that choice alone does not require that the jury automatically be so instructed on those inconsistent theories. Petitioner was required to put forth evidence to fairly support each theory of defense. *See Sims*, 319 Md. at 550 ("[A] defendant is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent.").

---

A person is privileged to *threaten or intentionally use* force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person. The actor may intentionally use only such force *or threat thereof* as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death or great bodily harm unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself.

*Gomaz*, 414 N.W.2d at 630 n.4 (emphases added) (quoting § 939.48).

31

Here, there was no evidence to support one of the two inconsistent theories now proffered by Petitioner.

Rather, the evidence supported only two theories: (1) that the stabbing was unintentional; or (2) that the stabbing was intentional but unprovoked, and Petitioner was the primary aggressor. Neither account presented any evidence tending to show that Petitioner subjectively believed stabbing Mr. Durrett was necessary for his safety. Thus, Petitioner did not meet the "some evidence" threshold to warrant generating an instruction as to imperfect self-defense. The trial judge did not err in refusing to give that instruction, and Petitioner received more than he was entitled to when the trial judge instructed the jury on perfect self-defense. Because the trial judge committed no error in declining to instruct the jury on imperfect self-defense, we do not opine on the second question presented regarding harmless error, and we affirm Petitioner's conviction.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

IN THE SUPREME COURT

OF MARYLAND

No. 22

September Term, 2023

_____

AARON JARVIS

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Dissenting Opinion by Watts, J., which Gould,
J., joins.

_____

Filed: August 12, 2024

*Hotten, J., now a Senior Justice, participated in
the hearing and conference of this case while an
active member of this Court. After being
recalled pursuant to the Maryland Constitution,
Article IV, § 3A, she also participated in the
decision and adoption of this opinion.

Respectfully, I dissent. I would hold that the Circuit Court for Cecil County abused its discretion in refusing to instruct the jury on imperfect self-defense and that its abuse of discretion was not harmless. The majority opinion holds that "the record shows that there was *no* evidence that Petitioner subjectively believed his use of deadly force was necessary for his safety[,]" and therefore "the trial judge did not err in declining to instruct the jury on imperfect self-defense." Maj. Op. 31. The Majority opinion perceives this as the correct result because, according to it, there were "two accounts of the events leading up to Petitioner stabbing Mr. Durrett"— "Under one, the stabbing was accidental. Under the other, the stabbing was intentional and unprovoked." Maj. Op. at 17.

There are at least two important aspects of the majority opinion with which I disagree. First, the Majority does not consider the evidence admitted at trial in its entirety and, in not doing so, fails to recognize that there was sufficient circumstantial evidence from which it could be inferred that Aaron Jarvis, Petitioner, feared serious bodily injury and stabbed Ethan Durrett because he believed it necessary to protect himself.

Second, the Majority takes an idiosyncratic approach to case law that largely ignores that the question before this Court is whether Mr. Jarvis generated "some evidence" to support giving the instruction and that it is acceptable for a defendant to pursue inconsistent defenses. The Majority focuses on the circumstance that, according to it, the stabbing was either accidental or intentional and unprovoked and therefore concludes that the imperfect self-defense instruction should not have been given. Under our case law, however, the question is not whether the stabbing was accidental, intentional, or unprovoked. The question is whether Mr. Jarvis believed that he was in danger of harm and believed that the

force he used was necessary to prevent the harm. Relying on a 1967 civil case that addresses the standard of proof required for a plaintiff to establish a *prima facie* case of negligence, the Majority concludes that the same standard should apply in this case. With respect to jury instructions in criminal cases, however, case law makes clear that a defendant need generate only "some evidence" in support of a requested instruction for it to be given and that the "some evidence" standard may be satisfied by both circumstantial and direct evidence, and that a defendant may pursue inconsistent defenses. See, e.g., Bazzle v. State, 426 Md. 541, 551, 45 A.3d 166, 171-72 (2012).

Although things such as provocation and intent may be factors in assessing a defendant's subjective belief, they are not dispositive. The existence or nonexistence of provocation is not what the giving of a self-defense instruction is based on. Rather, there must be some evidence that the defendant feared imminent harm and that the defendant believed the use of force at issue was necessary to prevent it. In this case, taking the evidence in the light most favorable to Mr. Jarvis, under a correct application of case law, there was sufficient evidence to generate an imperfect self-defense instruction. The record demonstrates that while pursing inconsistent defenses of accident and self-defense, Mr. Jarvis generated sufficient evidence, both direct and circumstantial, to warrant the giving of an imperfect self-defense instruction. A rational juror could easily have determined that Mr. Jarvis feared serious bodily harm and stabbed Mr. Durrett because he believed it was necessary to protect himself.

## I. The Imperfect Self-Defense Jury Instruction

In this case, Mr. Jarvis pursued two theories of defense: self-defense and accident. Based on the evidence, all of the requirements for a jury instruction on imperfect self-defense were met, including that there was "some evidence" that Mr. Jarvis believed he was in "apparent imminent or immediate danger of death or serious bodily harm from" Mr. Durrett, the victim (regardless of whether that belief was reasonable), and that there was "some evidence" that he believed that "the amount of force used was necessary" (regardless of whether that belief was reasonable). Porter v. State, 455 Md. 220, 234-35, 240, 166 A.3d 1044, 1053, 1056 (2017) (cleaned up).[1] There was ample evidence that Mr. Jarvis feared serious bodily harm by Mr. Durrett, *i.e.*, believed that he was in danger, and that, while the two men were in a physical altercation, Mr. Jarvis believed that using a pocketknife was necessary for his own safety, *i.e.*, believed that the amount of force he used was necessary.

To generate a jury instruction on self-defense, a defendant need only meet the "minimal" burden of pointing to "some evidence"—*i.e.*, "any evidence"—that, "if believed, would support his claim that he acted in self-defense[.]" Porter, 455 Md. at 240,

---

[1]It is undisputed that the other requirements for the jury instruction on imperfect self-defense were met. In its brief in the Appellate Court, the State acknowledged that the jury instruction on imperfect self-defense was a correct statement of the law and not fairly covered by the jury instructions given, which are two requirements for jury instructions. See Rainey v. State, 480 Md. 230, 255, 280 A.3d 697, 711 (2022) (cleaned up). Additionally, the State does not contest that there was "some evidence" that Mr. Jarvis was not the "aggressor or" the one who "provoked the conflict[,]" or that there was "some evidence" that he "believed that retreat was not safe[.]" Porter, 455 Md. at 235, 240, 166 A.3d at 1053, 1056 (cleaned up).

166 A.3d at 1056 (cleaned up). "[I]n evaluating whether competent evidence exists to generate the requested instruction, we view the evidence in the light most favorable to the accused." Bazzle, 426 Md. at 551, 45 A.3d at 172 (cleaned up). These principles apply regardless of whether the requested instruction concerns perfect or imperfect self-defense.

Our case law indicates that, where an instruction on perfect self-defense is generated, almost always, an instruction on imperfect self-defense is also generated. See Roach v. State, 358 Md. 418, 434, 749 A.2d 787, 795 (2000). Perfect self-defense requires that a person believe themself to be in apparent imminent or immediate danger of death or serious bodily harm, that the person not be the aggressor or the one who provoked the conflict, that the amount of force used not be unreasonable and excessive, and that the belief of apparent imminent or immediate danger be reasonable. See Porter, 455 Md. at 234-35, 166 A.3d at 1053. Where deadly force is used outside of a person's home, the person must have also reasonably believed that safely retreating or otherwise avoiding danger was impossible. See id. at 235, 166 A.3d at 1053.

An instruction on imperfect self-defense is generated where a person: (1) feared imminent or immediate serious bodily harm or death, i.e., had a belief that serious bodily harm or death was imminent, (2) believed that the amount of force used was necessary and, (3) in the case of deadly force used outside the home, that safely retreating or otherwise avoiding danger was impossible, and the beliefs need not be reasonable—the person need only show that such beliefs existed. See id. at 235, 166 A.3d at 1053. The key difference between the two (perfect and imperfect self-defense) is that, with perfect self-defense, the beliefs must be reasonable. See id. at 234-35, 166 A.3d at 1053. In this case, for the same

reasons that the evidence was sufficient to generate an instruction on perfect self-defense, for which a person's beliefs must be objectively reasonable, the evidence was also sufficient to demonstrate an instruction on imperfect self-defense, which does not have a reasonableness of beliefs requirement.

Viewed in the light most favorable to Mr. Jarvis, the evidence demonstrated that he was embroiled in a dispute with his brother-in-law, a much larger man, who demanded to meet with him in a dark or secluded area, and that, upon meeting his brother-in-law, he brandished a knife because he feared serious bodily harm. And, even though Mr. Jarvis displayed the pocketknife, his brother-in-law physically attacked him, causing Mr. Jarvis to grab him and stab him.

The nature of the evidence adduced at trial is critical to resolution of the issue of whether an instruction on imperfect self-defense was warranted. The evidence presented at trial established the following. Mr. Durrett and Mr. Jarvis are brothers-in-law and at some point, Mr. Jarvis took a car that belonged to their mother-in-law (*i.e.*, the mother of their wives, who are sisters) and, as a result, Mr. Durrett was angry with Mr. Jarvis and looking for him. Evidence demonstrating Mr. Jarvis's fear of harm by Mr. Durrett included a printout of text messages that the two men exchanged between midnight and 1 a.m. on the date of the stabbing, which the circuit court admitted as State's Exhibit 1. At 12:18 a.m., Mr. Durrett sent Mr. Jarvis a text message, telling him to return their mother-in-law's car. Mr. Durrett sent another text message stating that Mr. Jarvis's wife was "hysterically crying[,]" asking whether Mr. Jarvis was "sick in the head[,]" telling him to go home and "keep [his] mouth shut[,]" and concluding with: "[W]e don't need serious issues[.]"

After that, the two men exchanged text messages about meeting in person. Mr. Durrett told Mr. Jarvis to meet him behind a Wawa. Mr. Jarvis told Mr. Durrett to meet him at his apartment. Mr. Durrett said that he would meet Mr. Jarvis in a field near the apartment complex. Mr. Jarvis responded in pertinent part: "Dude it's pitch black there are no cameras come to my house." At 12:52 a.m., Mr. Durrett sent a text message stating: "Ok out in the field[.]"

The text messages that the two men exchanged are evidence of Mr. Jarvis's fear of harm by Mr. Durrett. First, Mr. Jarvis's refusal to meet Mr. Durrett behind the Wawa or in the field—where, according to Mr. Jarvis, it was "pitch black" and there were "no cameras"—indicates that Mr. Jarvis believed that the lights and security cameras at the apartment complex would deter Mr. Durrett from harming him. Second, the circumstance that the two men had an intense verbal altercation—during which Mr. Durrett accused Mr. Jarvis of being "sick in the head" and proposed meeting him in person—helps to explain why Mr. Jarvis feared such a meeting.

Additional evidence that Mr. Jarvis was afraid of harm by Mr. Durrett is Mr. Jarvis's testimony that, to avoid conflict, he refrained from parking in the main parking lot of the apartment complex. Mr. Jarvis's testimony indicated that he parked in an "accessory parking lot" rather than "the main parking lot," which was where visitors always parked because it was closer to his apartment. After Mr. Jarvis's counsel asked him why he parked in the accessory parking lot, he responded: "Because I wanted to avoid conflict." After Mr. Jarvis's counsel asked him whether he wanted to fight Mr. Durrett, he responded: "No[,]" and, after his counsel asked why not, he explained: "I just didn't desire an

altercation. There was no reason for me to." These parts of Mr. Jarvis's testimony indicate that he feared serious bodily harm by Mr. Durrett and tried to avoid him.

Despite Mr. Jarvis's efforts, the two men encountered each other. Mr. Durrett testified that his wife drove him to the apartment complex and "parked in a place where [they] normally" did not—ostensibly, the accessory parking lot where Mr. Jarvis parked. According to Mr. Durrett, he got out of the car, walked approximately 10 steps, and then saw Mr. Jarvis 20 or 30 feet away. Similarly, Mr. Jarvis testified that he got out of his car, turned around, and saw Mr. Durrett waiting for him, as close to him as the prosecutor was to the witness stand. According to Mr. Jarvis, he had not seen or heard Mr. Durrett before then because Mr. Durrett had been "dead silent."

At that point, Mr. Durrett communicated to Mr. Jarvis that he wanted Mr. Jarvis to approach him. Mr. Durrett testified that Mr. Jarvis said: "Yo, mother f[***]er" and that he "turned [his] back to [Mr. Jarvis] and said, 'Get over here. Let's talk, man.'" Mr. Jarvis's testimony indicated that, without saying anything, Mr. Durrett motioned for him to go over to the nearby field. This testimony demonstrates that Mr. Durrett actively sought an in-person confrontation—which, according to Mr. Jarvis, he was trying to avoid.

Mr. Jarvis testified that, after Mr. Durrett motioned for him to go over to the nearby field, he refrained from saying anything and headed toward his apartment, but Mr. Durrett cut him off. Mr. Jarvis's counsel asked him why he turned and walked away from Mr. Durrett, and he responded: "Because I didn't want any issues with him. I wanted to go home." This part of Mr. Jarvis's testimony is evidence that he avoided Mr. Durrett because

he was afraid of him and that the in-person confrontation occurred because Mr. Durrett forced it.

The most significant evidence that Mr. Jarvis feared serious bodily harm by Mr. Durrett, and that he believed that he needed to use a pocketknife, is Mr. Jarvis's testimony that, after Mr. Durrett cut him off, he yelled and took out a pocketknife because he was afraid of Mr. Durrett. In Mr. Jarvis's words: "I started, you know, raising my voice, yelling, trying to draw attention." After Mr. Jarvis's counsel asked him why he yelled, he responded: "Because I was afraid of him." "The yelling didn't work[,]" so Mr. Jarvis took out a pocketknife—*i.e.*, a folding knife—that he carried with him because he "work[ed] with [his] hands a lot." Mr. Jarvis "flicked the knife open just to brandish it, just hoping that he would see it." Mr. Jarvis's counsel asked him why he took out the pocketknife, and he responded: "Because I was afraid of him."[2] Mr. Jarvis explained: "He was sweating profusely. He was -- I don't want to say belligerent but he was being aggressive in his movements." If believed, these parts of Mr. Jarvis's testimony would support an inference that he feared serious bodily harm by Mr. Durrett and that he believed using the pocketknife was necessary for his own safety.

On cross-examination, Mr. Durrett acknowledged that he played football in high school, was approximately 6'1" and 175 pounds, and agreed with Mr. Jarvis's counsel that he is "quite a bit bigger than Mr. Jarvis[.]" Mr. Jarvis testified of Mr. Durrett: "He's much

---

[2]Mr. Jarvis added: "He looked like he was under the influence of something." The prosecutor made an objection, which the circuit court sustained. Clearly, the objection was not aimed at Mr. Jarvis's testimony that he took out the pocketknife because he was afraid of Mr. Durrett.

larger than me." The difference in size between Mr. Jarvis and Mr. Durrett supports an inference that Mr. Jarvis had reason to be afraid of Mr. Durrett and believed that using a pocketknife was a way to avoid harm.

Mr. Jarvis testified that, after he took out the pocketknife, Mr. Durrett approached him and swung at him. At that time, the pocketknife was in Mr. Jarvis's hand. Mr. Jarvis testified: "I ducked it in the nick of time. And I proceeded to grab him because I didn't want him to keep swinging at me." The two men fell to the ground. The pocketknife was in Mr. Jarvis's hand at that time and when Mr. Durrett was stabbed. After being stabbed, Mr. Durrett tried to take the pocketknife from Mr. Jarvis. Eventually, Mr. Jarvis let go of the pocketknife, which Mr. Durrett grabbed and threw.

This part of Mr. Jarvis's testimony constitutes evidence that he acted in self-defense by stabbing Mr. Durrett. Mr. Jarvis's testimony indicates that the pocketknife was in his hand when he grabbed Mr. Durrett, and he testified that the pocketknife was in his hand when Mr. Durrett was stabbed. Specifically, Mr. Jarvis testified that the pocketknife was in his right hand when the two men fell to the ground, and a registered nurse testified that Mr. Durrett's wound was on his left flank or the left side of his lower back. Tellingly, Mr. Durrett testified that he was stabbed when Mr. Jarvis "quick hugged" him. And, as the Majority acknowledges, Mr. Durrett testified that, during the altercation, he stated to Petitioner, "[Y]ou stabbed me didn't you?" to which Petitioner replied, "Yeah, mother [expletive], yes." Maj. Op at 17. All of this testimony gives rise to the reasonable inference that Mr. Jarvis intentionally stabbed Mr. Durrett because he feared serious bodily harm by Mr. Durrett.

Although the Majority acknowledges that, during the altercation, Mr. Jarvis stated that he stabbed Mr. Durrett and that this could be evidence that the stabbing was intentional, the Majority states: "But rather than establish that Petitioner acted under a belief that stabbing Mr. Durrett was an appropriate use of force in response to a threat, Mr. Durrett testified that Petitioner's use of deadly force was unprovoked and that Petitioner was the initial aggressor." Majority Op. at 17. This observation leads to the Majority's conclusion that there were two accounts of the events: one "accidental" and the other that "the stabbing was intentional and unprovoked." Majority Op. at 17. There are multiple problems with the Majority's approach. First, the Majority fails to consider all of the evidence. The Majority does not include in its analysis the fact that Mr. Jarvis testified that Mr. Durrett swung at him immediately before the stabbing. Nor does the Majority attempt to consider any of the circumstances that led up to the stabbing which would have given rise to an inference that Mr. Jarvis feared serious bodily harm and acted to protect himself. Rather than consider the evidence in the light most favorable to Mr. Jarvis as it is required to do, the Majority simply accepts Mr. Durrett's testimony as to how the stabbing occurred and concludes that it was "unprovoked."

The Majority concludes that because Mr. Durrett testified that the stabbing was unprovoked, an instruction on imperfect self-defense was not warranted. The Majority's assessment not only overlooks other evidence adduced at trial but also misapplies the law. The Majority is required to take the evidence in the light most favorable to Mr. Jarvis, which it fails to do. Applying that standard, the Majority is required to consider whether

there is some evidence that Mr. Jarvis feared serious bodily harm and responded with force he believed necessary, which it failed to do.

Instead, relying on Rodriguez v. Lynch, 246 Md. 623, 623, 626, 229 A.2d 83, 84, 85 (1967), a civil case from over 55 years ago, in which in assessing the sufficiency of evidence to establish a *prima facie* case of primary negligence, we stated that the light most favorable "does not require 'the taking of isolated sentences, or parts of sentences, in the testimony, and construing them out of context, without any regard to the rest of the witness's testimony[,]" the Majority concludes that, "[w]hile we have not made similar remarks in the criminal context when using the 'in the light most favorable' standard, say, when reviewing the sufficiency of the evidence for a criminal conviction, there is no reason to assume that the standard should be treated any differently when applied either in a civil or criminal case." Maj. Op. at 19 n.14. In my view, it is a mistake for the Majority to import the description of the light most favorable standard used in a civil case from a half a century ago to negate the conclusion that there was "some evidence" that Mr. Jarvis believed he was in imminent danger of serious bodily harm from Mr. Durrett, and that there was "some evidence" that he believed that the amount of force used was necessary.[3]

In Dykes v. State, 319 Md. 206, 208-09, 225, 571 A.2d 1251, 1253, 1261 (1990), where the defendant was found guilty of second-degree murder and the trial court refused

---

[3]Although the Majority does not explain exactly how this standard affects its analysis of Mr. Jarvis's testimony, I believe it is a standard that should not be incorporated into the some evidence analysis. It is quite possible that there will be cases in the future, involving review of a trial court's decision not to give a jury instruction, in which the standard may be used to undermine a defendant's testimony in a way that is more integral to the analysis of the evidence at issue.

to give instructions on perfect and imperfect self-defense, we reversed the judgment of the

Appellate Court and remanded the case for a new trial. We explained the "some evidence"

standard as follows:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden.

Id. at 216-17, 571 A.2d at 1257. Our holding in Dykes stands for the proposition that even

where evidence of self-defense is overwhelmed by evidence to the contrary, if there is any

evidence relied on by the defendant, which if believed would support his claim of self-

defense, the defendant has met his burden. This is the standard on which the Majority

should basis its analysis. In this case, there was direct evidence that Mr. Jarvis intended to

stab Mr. Durrett and more than enough circumstantial evidence from which a rational juror

could have inferred that Mr. Jarvis stabbed Mr. Durrett because he believed he was in

danger and that he believed stabbing Mr. Durrett was necessary to protect himself from

serious bodily injury.

To be sure, part of Mr. Jarvis's testimony indicated that the stabbing was accidental

rather than an act of self-defense.[4] Notwithstanding this part of Mr. Jarvis's testimony, the

---

[4]After Mr. Jarvis testified that he and Mr. Durrett fell to the ground, his counsel asked: "[D]id you know at that time that Mr. Durrett had been stabbed?", and he responded: "No." Mr. Jarvis denied knowing how Mr. Durrett was stabbed or that he intended to stab

- 12 -

evidence was sufficient to generate a jury instruction on imperfect self-defense. "In its assessment of the credibility of witnesses, a fact-finder is entitled to accept—or reject—all, part, or none of the testimony of any witness, whether that testimony was or was not contradicted or corroborated by any other evidence." Grimm v. State, 447 Md. 482, 506, 135 A.3d 844, 858 (2016) (cleaned up). It was for the trier of fact, *i.e.*, the jury, to find credible or not credible the part of Mr. Jarvis's testimony indicating that the stabbing was accidental.

Significantly, by finding Mr. Jarvis guilty of first-degree assault, the jury demonstrated that it found that the stabbing "was the result of an intentional or reckless act of the defendant and was not accidental[.]" Nicolas v. State, 426 Md. 385, 403-04, 44 A.3d 396, 407 (2012) (citations omitted). In other words, the jury evidently did not find credible Mr. Jarvis's testimony that he did not intend to stab Mr. Durrett or that the stabbing was accidental. Because no instruction on imperfect self-defense was given, it is possible that the jury believed that Mr. Jarvis stabbed Mr. Durrett because he feared bodily harm by Mr. Durrett—albeit while also believing that Mr. Jarvis's fear was unreasonable and thus did not warrant a finding of perfect self-defense.

Our holding in Roach, 358 Md. 418, 749 A.2d 787, reinforces the conclusion that it is not dispositive that Mr. Jarvis's testimony indicated that the stabbing was accidental. In Roach, id. at 432, 749 A.2d at 794, we held that the trial court was required to grant a

---

or kill Mr. Durrett. Also, Mr. Jarvis testified that Mr. Durrett's wife approached the two men and yelled at Mr. Durrett to get off Mr. Jarvis, that Mr. Durrett got up and said that he had been stabbed, and that Mr. Jarvis told Mr. Durrett and his wife: "I didn't mean for it to happen. I didn't mean for him to be wounded or to get stabbed, to get hurt."

request for a jury instruction on imperfect self-defense even though the defendant's trial testimony indicated that the victim was shot by accident. The defendant testified that he tried to take a gun from the victim, that they fell over a curb, and that a shot was fired when the victim was holding the gun and the defendant's hand was on top of the victim's. See id. at 423-24, 749 A.2d at 790. According to the defendant's testimony, a second shot was fired after the defendant pulled back and the victim lunged. See id. at 424, 749 A.2d at 790. By contrast, prior to trial, in a third statement to law enforcement, the defendant wrote of the victim: "I got the gun from him. . . . [H]e fell over the curb and tried to take the gun and I shot him but I didn't want to because I thought he was going to tr[y] to do something to me." Id. at 423, 749 A.2d at 789. As the circuit court did here, the trial court in Roach instructed the jury on perfect self-defense but refused to instruct the jury on imperfect self-defense. See id. at 425, 749 A.2d at 790.

We observed that we were "hard pressed to divine a situation where" such rulings would be correct—i.e., where "the defendant is entitled to a perfect self-defense instruction and yet is not also entitled to an imperfect self-defense instruction[.]" Id. at 434, 749 A.2d at 795. We pointed out that, "[g]enerally, if a defendant is entitled to an instruction with respect to the former, he will be entitled to an instruction with respect to the latter." Id. at 433, 749 A.2d at 795 (citation omitted). We explained that that is because, "if the reasonableness of a defendant's belief is at issue, as it is" with perfect self-defense, then "the existence of that belief is also at issue[,]" as it is with both perfect and imperfect self-defense. Id. at 433, 749 A.2d at 795 (citation omitted).

- 14 -

We concluded that, as is typical, both perfect and imperfect self-defense were at issue in <u>Roach</u> because the defendant's third statement to law enforcement constituted some evidence of self-defense. See <u>id.</u> at 432, 749 A.2d at 794. We determined that the statement refuted the State's contention that there was no evidence that the defendant believed that he needed to use force to defend himself against the victim. See <u>id.</u> at 432, 749 A.2d at 794. We explained that "[w]hether the jury would credit that statement, of course, must ultimately be left to the jury alone." <u>Id.</u> at 432, 749 A.2d at 794.

Significantly, we determined that, given that there was some evidence "that could have been viewed under the guise of self-defense[,]" it was immaterial that the defendant's testimony "encompassed solely a theory of an accidental shooting[.]" <u>Id.</u> at 425 n.2, 749 A.2d at 791 n.2. We acknowledged that "the defense of accident is inconsistent with self-defense[.]" <u>Id.</u> at 432, 749 A.2d at 794. We observed, however, that "a defendant may raise inconsistent defenses" and "is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent." <u>Id.</u> at 432, 749 A.2d at 794 (cleaned up).

Our holding in <u>Roach</u>, <u>id.</u> at 432, 749 A.2d at 794, establishes that a trial court must grant a request for a jury instruction on imperfect self-defense where, as here, there is some evidence of imperfect self-defense—even if the defendant pursues an inconsistent defense or indicates that the victim was harmed by accident. In <u>Roach</u>, <u>id.</u> at 423, 432, 749 A.2d at 789, 794, although the defendant's testimony indicated that the shootings were accidental, his third statement to law enforcement—in which he wrote: "I shot him but I didn't want to because I thought he was going to tr[y] to do something to me"—indicated

- 15 -

that the shootings were intentional acts of self-defense. Similarly, here, although part of Mr. Jarvis's testimony indicated that the stabbing was accidental, several other pieces of evidence—including his testimony that Mr. Durrett swung at him, that he grabbed Mr. Durrett, that the pocketknife was in his hand when Mr. Durrett was stabbed and the evidence of Mr. Jarvis's fear of harm by Mr. Durrett—gave rise to the inference that the stabbing was an act of self-defense.[5] Moreover, just as in Roach, there was direct evidence that the stabbing was intentional. As explained above, Mr. Durrett testified that, during the altercation, when he stated to Petitioner, "[Y]ou stabbed me didn't you?", Mr. Jarvis responded "Yeah, mother [expletive], yes." Thus, as in Roach, id. at 432, 749 A.2d at 794, the circuit court was required to grant Mr. Jarvis's request for a jury instruction on imperfect self-defense.

In trying to distinguish Roach, the Majority reasons that, unlike the defendant in that case, "there was no other evidence here that supported the theory that Petitioner intentionally stabbed Mr. Durrett *because* Petitioner subjectively believed that such deadly

---

[5]There is no doubt that Mr. Jarvis raised both the defense of self-defense and accident. Mr. Jarvis's counsel told the jury that he (Mr. Jarvis) acted in self-defense during opening statement and argued self-defense during his closing argument. During opening statement, Mr. Jarvis's counsel told the jury: "[W]hat you're going to have determine ultimately in this case is, where Mr. Jarvis is; who was the aggressor in the case; were Mr. Jarvis' actions justified; was there self-defense involved in this case." And, during his closing argument, Mr. Jarvis's counsel stated:

> This is not an attempted murder case. It's not first-degree assault case. If it is anything, if you don't believe Mr. Jarvis was self-defense -- if self-defense wasn't there, if this is anything, and that's up to you to decide, if it is anything, it's reckless endangerment, that he shouldn't have pulled the knife out. That's what this case is about.

force was necessary." Maj. Op. at 22 (emphasis in original). First, as discussed above, this is not an accurate account of either the direct or circumstantial evidence presented at trial. Second, the Majority overlooks in its analysis that Mr. Jarvis's beliefs need not be reasonable. Not once does the Majority address in its analysis that Mr. Jarvis's belief of harm need not have been reasonable. Third, the Majority overlooks that circumstantial evidence may establish that a defendant had a belief of serious imminent harm and believed the use of force was necessary to protect against the harm. By concluding that "the record shows that there was *no* evidence that Petitioner subjectively believed his use of deadly force was necessary for his safety[,]" Maj. Op. at 31, the Majority appears to have required direct evidence in the form of a statement or declaration from Mr. Jarvis to the effect that he believed the use of force was necessary for his protection. Viewing the evidence in the light most favorable to Mr. Jarvis, as we must, the evidence in its entirety established two different scenarios—one in which he accidentally stabbed Mr. Durrett, and one in which he intentionally stabbed Mr. Durrett in self-defense.[6]

The Majority's reliance on State v. Martin, 329 Md. 351, 619 A.2d 992 (1993), for the proposition that there is a distinction between intent and subjective belief adds nothing to the analysis of the issue at stake in this case. See Maj. Op. at 30. In Martin, 329 Md. at 362-63, 366, 619 A.2d at 997-99, we held that a jury instruction on imperfect self-defense

---

[6]Where a defendant offers some evidence of imperfect self-defense, "[t]he source of the evidence is immaterial[,]" as is the circumstance that the evidence "is overwhelmed by evidence to the contrary." Bazzle, 426 Md. at 551, 45 A.3d at 172 (citation omitted). It follows that a trial court must grant a request for a jury instruction on imperfect self-defense where, as here, part of the defendant's testimony is evidence of imperfect self-defense, regardless of whether other parts are not.

was inapplicable because other than expert opinion, there was no evidence that the defendant feared serious bodily harm by the victim or believed that deadly force was necessary at the time of the shooting.

On the night of the shooting, the defendant and the victim encountered each other twice. See id. at 354-55, 619 A.2d at 993-94. During the first encounter, the defendant and the victim had an argument during which the victim told the defendant to leave and not come back unless the victim said that he could. See id. at 354, 619 A.2d at 993. The victim indicated that, if the defendant did not comply, the victim would harm him. See id. at 354, 619 A.2d at 993. The defendant got into his vehicle and left. See id. at 354, 619 A.2d at 993.

A friend of the victim's drove him around for a while. See id. at 354, 619 A.2d at 993. The victim returned to the area and saw the defendant in his vehicle. See id. at 354, 619 A.2d at 993. The victim told his friend that he was going to walk over and see what the defendant was doing there. See id. at 354, 619 A.2d at 993. Afterward, the victim's friend heard a gunshot and saw the victim fall and the defendant's vehicle leave. See id. at 355, 619 A.2d at 993.

The defendant offered evidence that he had been too drunk to remember anything immediately before or after the shooting. See id. at 353, 619 A.2d at 993. The defendant "admitted consuming a significant amount of beer and smoking marijuana on the night in question." Id. at 355, 619 A.2d at 994.

A licensed pharmacist and professor of drug abuse education testified as a witness for the defendant and as an expert in the fields of pharmacology and toxicology. Id. at 356,

619 A.2d at 994. The defendant's expert opined that a person of the defendant's size who consumed 20 to 24 beers in a 12-hour period would have been "liable to experience an 'alcohol blackout,' *i.e.*, an alcohol-induced form of amnesia." Id. at 356, 619 A.2d at 994. The defendant's expert also opined that, if the defendant "consumed sufficient alcohol to produce a blood alcohol level of 0.2, as the testimony suggested he did, an 'explosive rage syndrome', characterized by very aggressive, assaultive, and out of control conduct[,] could have resulted." Id. at 356, 619 A.2d at 994.

We concluded that a jury instruction on imperfect self-defense was not warranted because there was no "evidence of the [defendant]'s state of mind at the time of the second encounter" other than the defendant's expert's opinions, which did not warrant such a jury instruction. Id. at 364, 366, 619 A.2d at 998-99. We observed that there was no eyewitness testimony as to the second encounter that the jury could have compared against the defendant's expert's opinions, and that an expert "cannot precisely reconstruct the emotions of a person at a specific time[.]" Id. at 366, 619 A.2d at 999. Thus, we determined that, although the defendant's expert's opinions related to the defendant's state of mind during the second encounter, those opinions could not have properly established that the defendant feared serious bodily harm by the victim during the second encounter. See id. 365-67, 619 A.2d at 999.

We disagreed with the defendant that the circumstances surrounding the first encounter were evidence of his state of mind during the second. See id. at 364-65, 619 A.2d at 998-99. We explained:

While the evidence of the second encounter may have been sufficient for the drawing of an inference that the respondent shot Gordy with the intention of killing him, because it provided no details of, or insight into, the circumstances of the shooting from the respondent's perspective, his acts, his words, his conduct, there was nothing from which to draw an inference as to what the respondent subjectively believed or felt when he fired the fatal shot.

Id. at 364, 619 A.2d at 364 (citation omitted). In other words, we explained that, even assuming that the defendant was afraid of the victim during the first encounter, it did not follow that he was still afraid of the victim during the second encounter, even though he intended to and did shoot the victim during the second encounter. See id. at 365, 619 A.2d at 998-99. In Martin, id. at 368, 619 A.2d at 1000, under facts very different from those of this case, we simply stated the obvious—that evidence of an intent to do bodily injury is not evidence that a person has a subjective belief or fear of bodily harm.

Under the circumstances of this case, applying the some evidence standard, it is not possible to conclude as the Majority does that taking the evidence "in the light most favorable to Petitioner, there was, at most, evidence that he had a fear of Mr. Durrett as to which he thought a proportional response was lunging at and grabbing Mr. Durrett." Maj. Op. at 27.[7] Unlike in Martin, here there was evidence of Mr. Jarvis's fear of serious bodily harm by Mr. Durrett, which did not come solely from "some earlier time" (e.g., when the

---

[7]Rather than considering the evidence in the light most favorable to Mr. Jarvis, the Majority seems to go out of its way to negate evidence that would support the conclusion that Mr. Jarvis believed himself to be in danger of serious bodily harm and responded accordingly. While the Majority states that, at most, the evidence shows that Mr. Jarvis believed it was necessary for him to lunge and grab Mr. Durrett, see Maj. Op. at 27, this part of the Majority's analysis ignores that Mr. Durrett testified that Mr. Jarvis confirmed that he had intended to stab him and the undisputed fact that Mr. Jarvis knowingly and intentionally grabbed Mr. Durrett while holding a knife.

two men were exchanging text messages).  Martin, 329 Md. at 368, 619 A.2d at 1000.

Except for the text messages that the two men exchanged in which Mr. Durrett expressed

his anger to Mr. Jarvis, evidence of Mr. Jarvis's fear of serious bodily harm by Mr. Durrett

pertained directly to the moments leading up to the stabbing.  Mr. Jarvis testified that, upon

his arrival, Mr. Durrett motioned for him to go to a nearby field.  Mr. Durrett testified that

he told Mr. Jarvis: "Get over here."  And Mr. Jarvis testified that he yelled and took out

the pocketknife because he was afraid of Mr. Durrett.  Mr. Jarvis testified that Mr. Durrett

then swung at him and that he grabbed Mr. Durrett to keep him from punching him again.

And Mr. Durrett testified, that during the altercation, Mr. Jarvis confirmed that he had in

fact stabbed him. Taking the evidence in the light most favorable to Mr. Jarvis, applying

the some evidence standard, there was sufficient evidence to generate an instruction on

imperfect self-defense.[8]

---

[8]Like Martin, the other cases that the State cites are distinguishable.  In Lambert v. State, 70 Md. App. 83, 97-98, 519 A.2d 1340, 1347, cert. denied, 309 Md. 605, 525 A.2d 1075 (1987), the Appellate Court held that the trial court was not required to instruct the jury on imperfect self-defense where the defendant "testified that his mind was a complete 'blank' during the incident."  Lambert is distinguishable because Mr. Jarvis testified about his state of mind in the moments leading up to the stabbing, explaining that he yelled and took out the pocketknife because he was afraid of Mr. Durrett.  In Sims v. State, 319 Md. 540, 553-55, 573 A.2d 1317, 1323-24 (1990), we held that the trial court was not required to instruct the jury on imperfect self-defense where the defendant testified that he was not present at the scene of the shooting.  Sims is distinguishable because Mr. Jarvis did not deny being present at the scene of the stabbing and even testified that the pocketknife was in his hand when Mr. Durrett was stabbed.  In Holt v. State, 236 Md. App. 604, 624, 182 A.3d 322, 334 (2018), the Appellate Court held that the trial court was not required to instruct the jury on imperfect self-defense where the defendant evidently did not testify and where "[n]o words were exchanged" as a group that included the victims approached a group that included the defendant, who shot at the other group.  Holt is distinguishable because there is ample evidence of Mr. Jarvis's state of mind at the relevant time, such as

## II. Harmless Error

I would hold that the circuit court's refusal to give an instruction on imperfect self-defense was not harmless. "When an appellate court considers the State's argument that an error is harmless, the court conducts its own independent review of the record." Belton v. State, 483 Md. 523, 541, 295 A.3d 612, 622 (2023) (cleaned up). Under a harmless error analysis, "an appellate court does not reverse a conviction based on a trial court's error or abuse of discretion where the appellate court is satisfied beyond a reasonable doubt that the trial court's error or abuse of discretion did not influence the verdict to the defendant's detriment." Ford v. State, 462 Md. 3, 41, 197 A.3d 1090, 1112 (2018) (citation omitted). "The harmless error standard is highly favorable to the defendant, and the burden is on the State to show that the error was harmless beyond a reasonable doubt and did not influence the outcome of the case." Perez v. State, 420 Md. 57, 66, 21 A.3d 1048, 1054 (2011) (cleaned up).

Because imperfect self-defense mitigates murder to voluntary manslaughter, had the circuit court instructed the jury on imperfect self-defense, the verdict sheet would have included attempted voluntary manslaughter and allowed the jury an opportunity to reach a verdict on the offense. See Porter, 455 Md. at 257, 166 A.3d at 1066. There is no reason to doubt that, had an instruction on imperfect self-defense been given, the jury still would have found Mr. Jarvis not guilty of attempted first- and second-degree murder. Aside from the possibility that the jury may have found Mr. Jarvis not guilty of both attempted

---

Mr. Jarvis's testimony that he was afraid of Mr. Durrett and Mr. Durrett's testimony that he told Mr. Jarvis: "Get over here."

voluntary manslaughter and first-degree assault, the jury would have had three options with regard to the two offenses. The jury could have found Mr. Jarvis guilty of both offenses, guilty of attempted voluntary manslaughter but not guilty of first-degree assault, or guilty of first-degree assault but not guilty of attempted voluntary manslaughter.

In two of the three scenarios, it is clear Mr. Jarvis would have been better off because he could not have been sentenced to the fifteen years of imprisonment that the circuit court imposed for first-degree assault,[9] which has a maximum sentence of twenty-five years of imprisonment. See Md. Code Ann., Crim. Law ("CR") § 3-202(c) (2002, 2021 Repl. Vol.). Instead, the most that the circuit court could have sentenced Mr. Jarvis to would have been ten years of imprisonment, which is the maximum sentence for attempted voluntary manslaughter. See CR §§ 1-201, 2-207(a).

Under the first scenario, if the jury found Mr. Jarvis guilty of both offenses, for sentencing purposes, the conviction for first-degree assault would have merged with the conviction for attempted voluntary manslaughter. That is because, with regard "to merger, first[-]degree assault, when committed under the modality of intentionally causing or attempting to cause serious physical injury to another, is a lesser included offense of attempted voluntary manslaughter." Christian v. State, 405 Md. 306, 321-22, 951 A.2d 832, 841 (2008) (citing Dixon v. State, 364 Md. 209, 241, 772 A.2d 283, 302 (2001)).

---

[9]As the Appellate Court concluded, the circuit court erred in also sentencing Mr. Jarvis for second-degree assault and reckless endangerment because, for sentencing purposes, the convictions for those offenses needed to merge with the conviction for first-degree assault. See Jarvis v. State, Sept. Term 2020, No. 744, 2023 WL 4676989, at *3 (Md. App. Ct. July 21, 2023).

Where a defendant is convicted of a greater offense and a lesser included offense based on the same conduct, the trial court may sentence the defendant only for the greater offense, regardless of whether it has a lower maximum sentence than the lesser included offense. See State v. Frazier, 469 Md. 627, 632, 231 A.3d 482, 485 (2020). As such, had the jury found Mr. Jarvis guilty of both offenses, he could have received only a ten-year sentence.

That also would have been the case had the jury found Mr. Jarvis guilty of attempted voluntary manslaughter but not guilty of first-degree assault. Had the jury done so (and Mr. Jarvis wisely chose not to object to those legally inconsistent verdicts),[10] he obviously could have received only a ten-year sentence for attempted voluntary manslaughter.

The third scenario is the thorniest to parse. The question is had the jury found Mr. Jarvis guilty of first-degree assault but not guilty of attempted voluntary manslaughter, whether he could have received only a ten-year sentence for first-degree assault where the

---

[10]"In a criminal case, verdicts are legally inconsistent where a defendant is convicted of an offense but acquitted of another offense that has the same elements as the offense of which the defendant was convicted." Williams v. State, 478 Md. 99, 105, 272 A.3d 347, 350 (2022) (citation omitted). "In other words, verdicts are legally inconsistent where a defendant is acquitted of a lesser included crime embraced within a conviction for a greater offense." Id. at 105, 272 A.3d at 350 (cleaned up).

Although "[l]egally inconsistent verdicts are impermissible in criminal trials[,]" it is up to the defendant whether to object to them. Id. at 105, 119, 272 A.3d at 350, 358 (citation omitted). Given that "it is the defendant who is entitled, should he or she so wish, to accept the benefit of the inconsistent acquittal[,]" the trial court cannot, on its own initiative, ask the jury to resolve the inconsistency, and the prosecutor cannot properly request that the trial court do so. Givens v. State, 449 Md. 433, 460, 144 A.3d 717, 733 (2016) (cleaned up).

Where the defendant objects to legally inconsistent verdicts, the trial court must essentially instruct the jury: "[Y]ou can't have it both ways. Give us two acquittals or give us two convictions." Id. at 460, 144 A.3d at 733 (cleaned up). "[F]ew defendants, enjoying the quite-unexpected boon of an inconsistent acquittal, are willing to roll the dice, double or nothing." Id. at 460, 144 A.3d at 733 (cleaned up).

State did not initially charge Mr. Jarvis with attempted voluntary manslaughter or nol pros such a charge. In my view, the State has not proven beyond a reasonable doubt that Mr. Jarvis could have, in fact, received the maximum sentence for first-degree assault if the jury found him guilty of that offense and not guilty of attempted voluntary manslaughter.[11]

We have repeatedly recognized that a defendant cannot be "punished more severely because of an acquittal on a charge." Simms v. State, 288 Md. 712, 723, 421 A.2d 957, 963 (1980); Gerald v. State, 299 Md. 138, 142, 472 A.2d 977, 979 (1984) (quoting Simms, 288 Md. at 723, 421 A.2d at 963); Johnson v. State, 310 Md. 681, 693, 531 A.2d 675, 681 (1987) (quoting Simms, 288 Md. at 723, 421 A.2d at 963); see also Dixon, 364 Md. at 231, 772 A.2d at 296.

In Simms, 288 Md. at 724, 421 A.2d at 964, we held that, "when a defendant is charged with a greater offense and a lesser included offense based on the same conduct, with jeopardy attaching to both charges at trial, and when the defendant is convicted only of the lesser included charge," the defendant "may not receive a sentence for that conviction which exceeds the maximum sentence which could have been imposed had he been convicted of the greater charge." In Simms, Gerald, and Johnson, we concluded that,

---

[11]A petition for writ of *certiorari* in Tionn Casey v. State of Maryland, Pet. Docket No. 347, Sept. Term, 2023, is pending decision in this Court. One of the questions presented in the petition is:

> When a defendant is charged with a greater offense and a lesser-included offense based on the same conduct and is convicted only of the lesser-included charge, can the sentence for that conviction exceed the maximum sentence which could have been levied had the defendant been convicted of the greater offense?

despite having been convicted of an offense that lacked a statutory maximum sentence at the time (*i.e.*, simple assault), the defendants could not be sentenced to more than ten years of imprisonment—which, at the relevant times, was the maximum sentence for: assault with the intent to rob (of which the defendant was acquitted in Simms v. State, one of two cases before us in Simms, and as to which the State abandoned a charge at trial in Thomas v. State, the other case before us in Simms); simple robbery (of which the defendant in Gerald was acquitted); and assault with the intent to maim, disfigure, or disable (as to which the State abandoned a charge at trial in Johnson). See Simms, 288 Md. at 714-18, 727, 421 A.2d at 958-60, 965; Gerald, 299 Md. at 143, 146, 472 A.2d at 980-81; Johnson, 310 Md. at 683-84, 531 A.2d at 676. The mandate of Simms and its progeny appears to be that an acquittal of an offense cannot result in a higher sentence than a conviction for that offense—regardless of the circumstance that the State did not initially charge Mr. Jarvis with that offense. See Dixon, 364 Md. at 231, 772 A.2d at 296.

And, as discussed above, had the jury found Mr. Jarvis guilty of attempted voluntary manslaughter, he could have received only a ten-year sentence for that offense, regardless of whether the jury also found him guilty of first-degree assault. I disagree with the State that there is no reasonable possibility that the jury would have found Mr. Jarvis guilty of attempted voluntary manslaughter had it been given the chance to do so. The State reasons that the evidence, jury instructions, and verdicts—including the acquittals of attempted first- and second-degree murder—indicate that the jury found that Mr. Jarvis did not intend to kill Mr. Durrett, or that the jury was not convinced beyond a reasonable doubt that he intended to kill Mr. Durrett. According to the State, it follows that the jury would not have

found Mr. Jarvis guilty of attempted voluntary manslaughter, one element of which is an intent to kill. See Christian, 405 Md. at 321, 951 A.2d at 841.

The problem with the State's reasoning is that it is essentially based on the premise that jurors are like computers, mechanically applying the law to the facts of the case. In actuality, jurors make up a group of twelve human beings tasked with reaching a unanimous verdict as to every charge. And, to be sure, "jurors are presumed to follow the jury instructions." Kazadi v. State, 467 Md. 1, 36, 223 A.3d 554, 575 (2020) (cleaned up). That said, it is a reality that juries sometimes engage in internal negotiations or compromise. See State v. Sayles, 472 Md. 207, 245, 244 A.3d 1139, 1161 (2021).

In this case, the State has not demonstrated beyond a reasonable doubt that the jury would not have convicted Mr. Jarvis of attempted voluntary manslaughter even though they acquitted him of attempted first- and second-degree murder. This conclusion is supported by the circumstance that, by finding Mr. Jarvis guilty of first-degree assault, the jury demonstrated that it found not credible his testimony that he did not intend to stab Mr. Durrett. There also is a reasonable possibility that the jury found not credible Mr. Jarvis's testimony that he did not intend to kill Mr. Durrett, but, for whatever reason, did not find Mr. Jarvis guilty of attempted second-degree murder. The bottom line is that the State has not proven under any scenario that the circuit court's refusal to give the instruction on imperfect self-defense was harmless beyond a reasonable doubt.

## III. Conclusion

I would reverse the judgment of the Appellate Court of Maryland, which affirmed Mr. Jarvis's convictions.  See Jarvis v. State, Sept. Term 2020, No. 744, 2023 WL 4676989, at *1 (Md. App. Ct. July 21, 2023).[12]

Justice Gould has authorized me to state that he joins this opinion.

---

[12]Mr. Jarvis requests that we remand for resentencing with instruction that the sentence for first-degree assault cannot exceed ten years of imprisonment—*i.e.*, the highest sentence that the circuit court could have imposed had it given the jury the chance to reach a verdict as to attempted voluntary manslaughter.  That seems to be the most appropriate remedy, given that the jury found Mr. Jarvis not guilty of attempted first- and second-degree murder and, thus, under the prohibition on double jeopardy, he cannot be retried for those offenses or for attempted voluntary manslaughter.  That is demonstrated by Ward v. State, 290 Md. 76, 79, 95, 427 A.2d 1008, 1010, 1019 (1981), in which the State nol prossed a charge for murder and we determined that the prohibition on double jeopardy "prevent[ed] the State from trying [the defendant] a second time for murder or manslaughter."